```
          IN THE UNITED STATES BANKRUPTCY COURT

          FOR THE SOUTHERN DISTRICT OF TEXAS

                     HOUSTON DIVISION

                                  )
IN RE                             )
                                  )
JEFFREY ALAN DOE and              )   CASE NO. 05-81309-G3-13
FELICIA MARIE DOE,                )
                                  )
          Debtors                 )
                                  )
```

MEMORANDUM OPINION

The court has considered the Motion For Valuation of Secured Claim of Unique Homes (Docket No. 16) filed by Jeffrey Alan Doe and Felicia Marie Doe ("Debtors"), and the Response (Docket No. 20) thereto, and after review of the file, pleadings, evidence and argument of counsel, the court values the collateral at $25,000.00 with 9% interest, for purposes of determining the secured amount of Unique Homes' claim. The following are the Findings of Fact and Conclusions of Law of the court. A separate conforming Judgment will be entered simultaneously with this Memorandum Opinion. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

Findings of Fact

1. Debtor filed a voluntary Chapter 13 petition on May 3, 2005. Docket No. 1.

2. Unique Homes ("Creditor") is the holder of a secured claim against the Debtors pursuant to a Retail Installment Sales Contract and a security interest in a used 1997 "Palm Harbor" manufactured home, 18' x 76', Serial Number PH077786 together with all furnishings, fixtures and appliances ("Home"). Creditor Exhibit No. 1. Creditor filed a Proof of Claim in the amount of $29,553.38. Creditor's Exhibit No. 11. The Debtors purchased the Home on or about August 1, 2004 for $32,066.57. The contract rate of interest is 14.75%.

3. Debtors' proposed Chapter 13 plan reflects that the value of the Home is $13,930 and they propose to pay 6% interest on the claim. Docket No. 4. Debtors contend that the manufactured home that they purchased from Unique Homes is not the model listed on the Retail Installment Sales Contract. Debtors request that the court determine the secured value of the Home. Debtors' valuation of the collateral for plan purposes was based upon a Brazoria County, Texas tax statement that appears to have been obtained from the County's website. Testimony of Jeffrey Doe, Debtors' Exhibit A.

4. The court notes that the legal description of the manufactured home on the tax statement is the same description found on the Sales Contract. Further, the tax statement reflects a date of October 28, 2004 which would appear to be the date the statement was printed. The court takes judicial notice of the

2005 Brazoria County tax records which reflect that the collateral is valued at $22,860.

      5.   Kevin Desormeaux, a contractor, testified that he has appraised hundreds of manufactured homes since 1992. He inspected and measured the Home and found the width to be 16 feet instead of 18 feet as reflected on the Sales Contract. Desormeaux testified that the only way to determine with certainty the make and manufacturer of the Home is to inspect what he referred to as the "Dataplate." The Dataplate on this Home was missing.

      6.   Desormeaux testified that he could not prepare an official appraisal report due to the missing Dataplate but he did prepare a "Book Value Form." He used a base value for a Palm Harbor Homes, Riverbend, manufactured home measuring 16 feet by 76 feet. Desormeaux found the home to be in fair condition. He concluded that the Home's total adjusted value was $24,666.18. A notation on the form indicates that Desormeaux was unable to determine the true model of the home and therefore the value was based upon the sales sheet. Debtors' Exhibit B. Contrary to the valuation reflected on the form prepared by Desormeaux, he testified at the hearing on the instant motion that the Home only has a value of approximately $19,000 to $20,000.

3

7. John Tortorice, Sales Manager for Unique Homes, testified that he has seen Debtors' manufactured home. He considered it to be 18 feet wide since his measurement included the width of the eaves. He testified that the Home was in good condition and little preparatory work was needed prior to its sale to Debtors. Tortorice also testified that Unique Homes' comparable sales of manufactured homes measuring 16 feet by 76 feet during June, August, and October, 2004 were $24,500, $26,000 and $29,556.57, respectively. Creditor Exhibit No. 6.

8. The Home was obtained by Unique Homes from a foreclosure sale. The Certificates of Title issued by the Texas Department of Housing and Community Affairs relating to the Home reflect that the Home was manufactured by Palm Harbor Homes in June 1997 and sold by Palm Harbor Homes on August 5, 1997. It was foreclosed upon and Unique Homes obtained title to the collateral on August 20, 2001. The description of the home on the Certificates of Title is the same as reflected on the Sales Contract. Creditor's Exhibit No. 12.

9. Martin Ellis, Financial Manager and custodian of records of Creditor, testified that the Home (without personal effects) was insured by the Debtors in the amount of $32,000, as reflected by the Declarations Page issued by Debtors' insurer, Formost. Creditor's Exhibit No. 10.

10. The court need not determine the make and model of the Home in order to value it. The Home was inspected by Desormeaux as well as Tortorice. Their testimony and the evidence presented is sufficient for this court to make a determination as to value.

11. The valuation process is not an exact science and valuation determinations are often based on estimates and approximations, and to some extent, speculation. Considering the circumstances of the instant case, including the issue of the make and model of the Home, the valuation by Desormeaux, the amount of insurance coverage, the Brazoria County 2005 tax appraisal, comparable homes, and the fact that Debtors intend to retain the collateral, the court finds that Debtor's 1997 "Palm Harbor" manufactured home, 18' x 76', Serial Number PH077786 together with all furnishings, fixtures and appliances is valued at $25,000.

12. The contract rate of interest on Debtors' loan is 14.75%. The court is concerned that Creditor receive compensation in exchange for the present right to foreclose and liquidate its position. The court notes that the Federal Funds Rate is the primary tool that the Federal Open Market Committee uses to influence interest rates and the economy. Changes in the Federal Funds rate have far-reaching effects by influencing the borrowing cost of banks in the overnight lending market, and

subsequently the returns offered on bank deposit products such as certificates of deposit, savings accounts, and money market accounts.  Changes in the Federal Funds rate and the Discount Rate also dictate changes in the Wall Street Journal Prime Rate.  The prime rate is the underlying index for most credit cards, home equity loans and lines of credit, auto loans, and personal loans.  The prime interest rate by the Wall Street Journal as of March 1, 2006 is 7.5%.  In order to compensate Creditor and  in light of current market conditions, the court finds that 9% interest is reasonable.  See *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

## Conclusions of Law

1.   Section 506(a) provides that an allowed claim is a secured claim only to the extent "of the value of such creditor's interest in the estate's interest in property..."  Thus, section 506(a) directs a determination of (i) the estate's interest in the collateral to be valued, and (ii) the creditor's interest in that interest.

2.   Once the court has identified the creditor's interest in the estate's interest in the collateral, the court must then determine the relevant valuation standard to be applied in valuing the creditor's interest.  Section 506(a) instructs the court to consider the purpose of the valuation and the proposed disposition of the collateral.

3. The purpose of the valuation in this case is to determine how much the Debtors have to pay the secured creditor in order to confirm their plan in accordance with 11 U.S.C. § 1325(a)(5). The proposed use of the collateral is the Debtors' continued retention and use of the home. See 4 *Collier on Bankruptcy* ¶ 506.03[7] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005) and cases cited therein.

4. For purposes of determining the amount that must be paid to a secured creditor under a plan when Debtor retains the collateral, the question of value under section 506(a) turns on the value of the debtor's proposed use of the relevant property under the plan, not the value achievable in a foreclosure scenario that is not proposed, even though the reorganization may ultimately fail and the creditor may foreclose on its collateral as a result. *See Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

5. The Supreme Court determined that the appropriate method of valuation is the hypothetical purchase method, defined as replacement value measured at what the debtor must pay for like property of the same condition and age. However, the Supreme Court did not specify particulars:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to the bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value,

      wholesale value, or some other value will depend on the type of debtor and the nature of the property.

*Associates Commercial Corp. v. Rash*, 520 U.S. 953, 965, 117 S.Ct. 1879, 1886 n.6, 138 L.Ed.2d 148, 160 (1997).

      6.   The Supreme Court in *Rash* recognized the concern that a creditor receive compensation and protection in exchange for the tangible loss of valuable nonbankruptcy rights, such as the present right to foreclose and liquidate its position. Although the collateral being valued in *Rash* was a vehicle, the Supreme Court's focus was on the appropriate standard to use to measure the value of the creditor's allowed secured claim with respect to property that the debtor proposed to retain during the term of its plan. *See Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962-63, 117 S.Ct. 1879, 1885, 138 L.Ed.2d 148, 158 (1997); See 4 *Collier on Bankruptcy* ¶ 506.03[7] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005).

      7.   Similarly, in valuing collateral that the debtor proposes to retain and use in the cram down context, the bankruptcy court may have to adjust its determination to the extent that it reflects "the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 965 n.6, 117 S.Ct. 1879, 1886 n.6, 138 L.Ed.2d 148, 160 n.6 (1997).

8. Determinations of value in the bankruptcy context do not rise to the level of "mathematical certitude." *Consolidated Rock Prods. Co., v. Du Bois*, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982 (1941). Even when opined upon by experts, valuation determinations often "depend on assumptions, predictions, and, to some extent, speculation." *See In re EFH Grove Tower Assocs.*, 105 B.R. 310, 314 (Bankr. E.D.N.C. 1989); *see also In re Simmons*, 113 B.R. 942, 947 (Bankr. W.D.Tex. 1990).

9. A separate Judgment will be entered valuing the 1997 "Palm Harbor" manufactured home, 18' x 76', Serial Number PH077786, together with all furnishings, fixtures and appliances at $25,000.00, with interest at the rate of 9% for purposes of determining the secured amount of Unique Homes' claim.

Signed at Houston, Texas on this 2nd day of March, 2006.

_____
LETITIA Z. CLARK
UNITED STATES BANKRUPTCY JUDGE